WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
            v.                 )      No. 06 MJ 4013 PCT MEA
                               )
BERRA TAWAHONGVA,              )      MEMORANDUM AND ORDER
                               )
            Defendant.         )
_____)

Before the Court is Defendant's Motion to Dismiss, asserting a conviction on the charge against him, a violation of the Migratory Bird Treaty Act, would be unconstitutional. Defendant contends his conviction would violate his right to the free exercise of his religion, guaranteed by the First Amendment to the United States Constitution. Defendant argues that requiring him to acquire a permit prior to taking golden eagles constitutes a substantial burden on the free exercise of his religion and, therefore, that the Religious Freedom Restoration Act prohibits his prosecution for failing to obtain such a permit.

The Court conducted an evidentiary hearing on Defendant's motion on August 22, 2006. For the reasons that follow, Defendant's motion to dismiss the charge against him is **denied.**

## Factual Background and Procedural History

Pursuant to a search warrant, in early June of 2005 United States Fish and Wildlife Service officers searched a fenced area behind Defendant's residence within the boundaries of the Hopi reservation and seized two live golden eagles. Prior to executing the warrant the officers ascertained the Hopi tribal government had not issued a permit to Defendant to take or possess golden eagles. Defendant was charged with violation of the Bald and Golden Eagle Protection Act, 16 U.S.C. § 668(a) and 18 U.S.C. § 2 (Count I); violation of the Migratory Bird Treaty Act, 16 U.S.C. § 703 and 18 U.S.C. § 2 (Count II); and violation of the Lacey Act and Hopi law regarding possession of golden eagles without a permit (Count III). On May 4, 2006, the Court granted the government's motion to dismiss counts one and three of the complaint. The remaining charge is a Class B misdemeanor, punishable by imprisonment for a term of up to six months and a fine of up to $15,000, or both. See 16 U.S.C. § 707(a) (2000 & Supp. 2006).

The Migratory Bird Treaty Act ("MBTA"), codified at 16 U.S.C. 703-712,[1] provides:

---

[1] The federal regulations governing compliance with and enforcement of the MBTA are found in section 50 of the Code of Federal Regulations, at Part 13 and Part 21. Part 13 and Part 21 do not explicitly provide for an exception to the MBTA for the religious purposes of American Indian tribes.

Part 22, governing the enforcement of the Bald and Golden Eagle Protection Act, codified at 16 U.S.C. §§ 668-668d, provides:

> This part controls the taking, possession, and transportation within the United States of bald and golden eagles for scientific, educational, and depredation control purposes and for the religious purposes of American Indian tribes. ...

50 C.F.R. § 22.1 (2006).

> Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof, [including golden eagles].

Id. § 703(a).

The MBTA was enacted in 1918.  Congress ratified the relevant international treaties[2] regarding protection of migratory bird species and enacted the MBTA to effectuate the

_____

[2]  The Migratory Bird Treaty Act was originally enacted to implement a 1916 treaty between the United States and Great Britain (acting on behalf of Canada).  See Convention for the Protection of Migratory Birds, U.S.-U.K., Aug. 16, 1916, 39 Stat. 1702.  Other similar treaties were entered into with Mexico in 1936, with Japan in 1972, and with the former Soviet Union in 1976.  See Convention for the Protection of Migratory Birds and Game Mammals, U.S.-Mex., Feb. 7, 1936, 50 Stat. 1311; Convention for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, U.S.-Japan, Mar. 4, 1972, 25 U.S.T. 3329; Convention Concerning the Conservation of Migratory Birds and Their Environment, U.S.-U.S.S.R., Nov. 19, 1976, 29 U.S.T. 4647.  Each of these treaties has been modified since its adoption by additional conventions and protocols, generally to enhance protection of the listed species.  For a general discussion of the treaties and conventions concerning the MBTA, see United States v. Hardman, 297 F.3d 1116, 1121 n.10 (10th Cir. 2002) (en banc); Hill v. Norton, 275 F.3d 98, 105-06 (D.C. Cir. 2001); United States v. Moon Lake Electric Association, Inc., 45 F. Supp. 2d 1070, 1080 (D. Colo. 1999).  See also Kevin J. Worthen, Eagle Feathers and Equality: Lessons on Religious Exceptions from the Native American Experience, 76 U. Colo. L. Rev. 989 (2005); Hye-Jong Linda Lee, The Pragmatic Migratory Bird Treaty Act: Protecting "Property," 31 B.C. Envtl. Aff. L. Rev. 649 (2004).

United States' compliance with those treaties in recognition of the harm posed by unregulated taking of golden eagles and other migratory birds to those species' existence.  See 74 Stat. 866; H.R. Rep. No. 1787, 86th Cong., 2d Sess. (1960); S. Rep. No. 1779, 86th Cong., 2d Sess. (1960).  See also Andrus v. Allard, 444 U.S. 51, 62, 100 S. Ct. 318, 325 (1979).  The United States Congress has repeatedly avowed the purpose of the MBTA and amending legislation to be maintaining healthy populations of migratory birds in North America.  See, e.g., S. Rep. No. 92-1159, 92nd Cong., 2d Sess. 1972, 1972 U.S.C.C.A.N. 4285; North American Wetlands Conservation Act of 1989, Pub. L. No. 101-233, § 2(a), 103 Stat. 1968, codified at 16 U.S.C. § 4401.  Congress' desire to protect golden eagles was clearly evidenced by amendment of the 1940 Bald Eagle Protection Act in 1962 to add golden eagles to bald eagles as a species protected by this legislation.[3]

The MBTA prohibits the possession and taking of golden eagles except as otherwise provided by law.  Federal law allows for the otherwise prohibited taking and possession of live golden eagles for religious uses by practitioners of American

---

[3] See Golden Eagle Protection Act, Pub. L. No. 87-884, 76 Stat. 1246 (1962), codified as amended at 16 U.S.C. § 668 (2000 & Supp. 2006).  Protection was extended to golden eagles, inter alia, because it is difficult to distinguish between the eaglets of golden eagles and bald eagles.  Therefore, "protection of the golden eagle will afford greater protection for the bald eagle ... because the bald eagle is often killed by persons mistaking it for the golden eagle." Id.  In addition to the Native American religious use exception, the 1962 Act authorized "the taking of golden eagles for the purpose of seasonally protecting domesticated flocks and herds...." Id. § 668a. However, all exceptions to the prohibition against taking eagles are subject to the requirement that the permitted activity be "compatible with the preservation" of the species.  Id.

Indian religions.  To accommodate the religious practice of the Hopi, specifically, the United States Fish and Wildlife Service ("USFWS") has promulgated regulations allowing Hopi to lawfully obtain and possess golden eagles for their religious use.

The USFWS has issued permits to take eagles to the Hopi annually since 1986.  See Docket No. 40, Attach.[4]  The USFWS permitted the Hopi to "take" from Hopi reservation lands from twelve to an unlimited number of golden eagles per year for religious use from 1986 through 1996.  Id.  The permitted annual "take" from 1997 through 2005 from reservation lands has been 40 golden eagles.  Id.  The reported annual take of golden eagles by the Hopi from reservation lands from 1997 through 2003 has varied from as few as two birds to as many as 38 birds.  Id., Attach.  Additionally, the State of Arizona has permitted the Hopi to take ten golden eagles per year from state lands, and the Navajo Nation has permitted the Hopi to take twelve eagles per year from Navajo reservation lands each year from 1998 through 2003.  Id.

A USFWS agent has represented to the Court that the USFWS issued a permit in 2005 in the name of Wayne Taylor, Jr., Chairman and Chief Executive Officer of the Hopi Tribe, allowing the Chairman "and tribal members designated by him" to "take" forty golden eagles in the year 2005.[5]  Docket No. 1, Attach.

---

[4] United States Fish and Wildlife Service, Statement of Decision, Migratory Bird Treaty Act Permit to Take Golden Eagles for Religious Purposes by the Hopi Tribe on Ancestral Lands (Apr. 2003).

[5] At the evidentiary hearing Defendant asserted the permit system is contrary to law because the governing section of the Code of Federal Regulations, 50 C.F.R. 22.2 requires the United States Fish and Wildlife Service to issue the permits to take golden eagles to

1   (Statement of Probable Cause).

2   Additionally, the Hopi Tribal Council has adopted
3   tribal regulations, involving a permit system, for the taking of
4   live golden eagles for religious purposes from Hopi reservation
5   lands, from state trust lands, from the former Navajo-Hopi joint
6   use area, and from exclusively Navajo tribal lands.  See Hopi
7   Tribe Wildlife Ordinance Nos. 48, 7.11, 7.16.   The tribal
8   regulations were enacted in accordance with the Hopi tribal
9   government's obligation to Hopi people to negotiate with other
10  sovereign entities to preserve the traditional Hopi practice of
11  gathering golden eagles for religious purposes.

12  The Hopi eagle permit system is administered by the
13  tribal Cultural Preservation Office ("CPO").   The testimony
14  presented at the hearing indicated the CPO regulates the
15  issuance of permits to ensure that specific golden eagle
16  acquiring sites historically utilized by specific village and
17  clan affiliations are not trespassed upon by others,[6] and to

18  _____

19  "individuals."  However, Defendant did not present this argument in
    his motion to dismiss and the Court deemed the argument waived as not
20  properly before the Court because the government had not been allowed
    time to evaluate this assertion.  Cf. United States v. Sandia, 188
21  F.3d 1215, 1218 n.2 (10th Cir. 1999) (holding appellant who did not
    raise issue until oral argument had waived it).  Furthermore, a new
22  motion to dismiss predicated on this defense would not be timely
    filed.  Pursuant to the Court's order of May 8, 2006, at Docket No.
23  23, pretrial motions were to be filed no later than June 2, 2006.

24      [6]
        Throughout the entire 1882 reservation, and beyond, the
25  Hopis had numerous ceremonial shrines, some of which they
    had maintained and visited for hundreds of years.   These
26  Hopi shrines were of two kinds, the Kachina shrines and the
    eagle shrines.   The Kachina shrines were the same for all
27  Hopi mesas and clans, but the eagle shrines belonged to one
    or the other of the clans of the different pueblos.  Eagle
28  shrines were associated with the collection of young eagles
    from the eagle nests in the cliffs, at least one eagle

preserve the longevity of the golden eagle population historically resident on Hopi reservation land.

A Hopi tribal natural resources officer testified a Hopi individual may obtain a permit to take a golden eagle by going to the CPO office and filling out the requisite application, without any required waiting period or prepayment of any fee.[7]  The testimony presented at the hearing indicates the eaglets are optimally "taken" in May or June, when they are fledged, and that they are sacrificed, or returned, during the Niman Kachina ceremony in July.  The hearing testimony indicated that, on some occasions, the CPO has issued a permit after an eagle has been taken.  It is not disputed that, in 2005, only 21 of the 40 available permits were dispensed by the Cultural Preservation Office; 19 permits were available that year to qualified individuals, including Defendant, had they applied for the permits.

---

always being left in the nest.  The hunting of eagles was accompanied by rituals involving the use of corn pollen and prayer sticks, conducted at a particular site before the young eagles were seized.  The young eagles were then taken back to the villages, raised to a certain size when they were killed, and the feathers used for ceremonial purposes.  The Navajos as well as the Hopis had sacred places both within and without the 1882 reservation. These were, for the most part, eagle-catching shrines, but the Navajos probably had less need than the Hopis for the use of eagle feathers in their ceremonials.
Healing v. Jones, 210 F. Supp. 125, 192 (D. Ariz. 1962).

[7] One must be an enrolled tribal member to acquire a permit to take a golden eagle on Hopi reservation land.  The Court notes some Hopi, who are sometimes referred to as "traditional," believe it an affront to be required to have someone else formally acknowledge them as being Hopi, and that traditional Hopi do not agree that the tribal and federal forms of government currently in place validly exercise authority over them.

The parties do not dispute Defendant is an enrolled member of the Hopi, a federally-recognized American Indian tribe, who, as such, is eligible to receive a permit to take golden eagles. The government does not dispute that Defendant, who is a member of the Coyote clan, is an elder in the One-Horn kiva of Mishongnovi, and that to fulfill his religious duties to the kiva he must collect golden eagles each year. The parties do not dispute the use of live golden eagles is a central tenet of Hopi religious practice, which has continued since "time immemorial."[8] The Court notes that evidence presented at the

---

[8]

The practice of eagle gathering is at the heart of the Hopi religious ceremonial cycle and the Hopi culture. The eagle serves as the link between the spiritual world and the physical world of the Hopi, a connection that embodies the very essence of Hopi spirituality and belief. Golden eaglets are gathered from nests soon after birth and are kept and raised to fledglings in Hopi villages. Later, during the Niman Kachina ceremony, the golden eagles are sacrificed and "sent" to their spiritual home. The eagles' feathers are subsequently used in all Hopi religious ceremonies such as the Kachina, Flute, and Snake ceremonies. The cyclical relationship between the eagle and the Hopi is renewed annually through the practice of eaglet gathering, sustaining the connection between the spiritual and physical worlds for the next generation of Hopi.
    The importance that the Hopi attach to the ceremonial gathering of eagles is expressed in Article IV of the Tribal Constitution approved by Secretary of the Interior Ickes on December 19, 1936:

    The Tribal Council shall negotiate with the United States Government agencies concerned, and with other tribes and other persons concerned, in order to secure protection of the right of the Hopi Tribe to hunt for eagles in its traditional territories, and to secure adequate protection for its outlying, established shrines.

Only a few of the Hopi clan and religious societies bear the important ceremonial obligation of eagle gathering, and each of these has a traditional area from which it--and no other clan or society that is not related to it--may gather eagles. Hopi clan ownership of traditional eagle nests is well documented in the anthropological literature. ... "The territory around the Hopi villages where eagles may be

-8-

hearing indicated that, in 2005, a Kikmongwi[9] from the village of Mishongnovi was issued a permit to take eagles by the CPO.

**Analysis**

**Standard for granting or denying a motion to dismiss a criminal charge**

Federal Rule of Criminal Procedure 12(b)(2) provides "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R. Crim. P. 12(b)(2) (2006). A charge in a complaint may be dismissed if it is subject to a defense that may be decided solely on issues of law. Cf. <u>United States v. Labs of Virginia, Inc.</u>, 272 F. Supp. 2d 764, 768 (N.D. Ill. 2003) (in the context of a motion to dismiss an indictment); <u>United States v. Flores</u>, 404 F.3d 320, 324 (5th Cir. 2005)

---

found is, and has been from time immemorial, divided into portions or allotments, which are controlled by certain clans or families. These territories extend as far as 50 and 60 miles from the villages." H.R. Voth, Notes on the Eagle Cult of the Hopi, collected in H.R. Voth, Brief Miscellaneous Hopi Papers, Field Columbian Museum, Publication 157, 107-109, Anthropological Series 11(2)(1912). ...

Proposed Rules, Special Regulations; Areas of the National Park System; Religious Ceremonial Collection of Golden Eaglets From Wupatki National Monument, 66 F.R. 6516, 6517 (2001).

[9]

The Hopi Tribal Constitution[] grants special powers to traditional religious leaders known as Kikmongwi, who must certify village representatives to the tribal council, [] and who have the power to call for an election on proposed village constitutions[]. Moreover, until otherwise organized, villages are to be governed "under the traditional Hopi organization, and the Kikmongwi of such village shall be recognized as its leader." [].

Worthen, *Eagle Feathers and Equality: Lessons on Religious Exceptions from the Native American Experience*, 76 U. Colo. L. Rev. at 1020 n.108 (internal citations omitted).

1   ("[t]he propriety of granting a motion to dismiss an indictment

2   under [Rule 12, Federal Rules of Criminal Procedure] by pretrial

3   motion is by-and-large contingent upon whether the infirmity in

4   the prosecution is essentially one of law or involves

5   determinations of fact. If a question of law is involved, then

6   consideration of the motion is generally proper."). See also

7   United States v. Marzook, 426 F. Supp. 2d 820, 823-24 (N.D. Ill.

8   2006); United States v. Bodmer, 342 F. Supp. 2d 176, 180

9   (S.D.N.Y. 2004). Arguments raised in a motion to dismiss that

10  rely on disputed facts should be denied. United States v.

11  Caputo, 288 F. Supp. 2d 912, 916 (N.D. Ill. 2003), citing United

12  States v. Shriver, 989 F.2d 898, 906 (7th Cir. 1992).[10]

13

14

15

16

---

17   [10] This last rule is relevant in the context of whether Defendant
18   is charged with bartering eagle parts. To prevail on a free exercise
     of religion defense to a charge of illegal possession of eagles, the
19   defendant must establish his possession of the eagles was solely for
     a personal religious purpose, rather than a commercial purpose. See
20   United States v. Hugs, 109 F.3d 1375, 1377-78 (9th Cir. 1997)
     (concluding that criminal defendants asserting a free exercise defense
21   to charges of illegal possession of eagle parts bore the burden of
     establishing the eagles they were accused of possessing were acquired
22   for their own religious use, rather than commercial use); United
     States v. Sandia, 188 F.3d 1215, 1218 (10th Cir. 1999) (concluding the
23   defendant's subsequent sale of eagles collected for his religious use
     defeated his assertion he had standing to request an evidentiary
24   hearing on the issue of the free exercise of his religion in the
     context of an MBTA case).
25        The testimony presented at the evidentiary hearing on this point
     was not clear; Defendant denied he ever bartered eagles or eagle
26   parts. Testimony suggested Defendant may have received some "gifts"
     from a person to whom he had given eagle feathers; no witness
27   testified Defendant had ever bartered eagles or feathers. Therefore,
     the Court presumes for the purpose of this memorandum and order only
28   that the government does not assert Defendant's possession of the
     subject eagles was for other than his personal religious use.

1    **Defendant's claim his prosecution violates his**

2    **constitutional right to the free exercise of his religion.**

3           Defendant raises a free exercise of religion challenge

4    to the criminal charge against him, a violation of the Migratory

5    Bird Treaty Act ("MBTA"), i.e., illegal possession of a golden

6    eagle.  In his motion to dismiss, Defendant cites, inter alia,

7    the First Amendment, the Religious Freedom Restoration Act, and

8    the American Indian Religious Freedom Act.[11]  Docket No. 27.

9    _____

10          [11]  Defendant further contends the "permits allocation regime
     also violates the Fifth Amendment, Title VI of the Civil Rights Act
11   of 1964, the Omnibus Crime Control and Safe Streets Act of 1968, and
     the Indian Civil Rights Act of 1968."  Docket No. 27 at 3.  However,
12   because Defendant did not argue the merits of a defense pursuant to
     any of these statutes in his pleadings or at the evidentiary hearing,
13   to the extent Defendant's motion to dismiss is predicated on any of
     these causes of action, the motion is denied.
14          Additionally, Defendant's citation to the American Indian
     Religious Freedom Act (AIRFA) as a defense is misplaced.  The AIRFA,
15   enacted in 1978, declares it "the policy of the United States to
     protect and preserve for American Indians their inherent right to
16   freedom to believe, express and exercise the[ir] traditional religions
     ... including but not limited to access to sites, use and possession
17   of sacred objects, and the freedom to worship through ceremonials and
     traditional rites." 42 U.S.C. 1996 (2003 & Supp. 2006).  The AIRFA
18   requires federal agencies to consider, but not necessarily to defer
     to, Indian religious values.  See Wilson v. Block, 708 F.2d 735, 747
19   (D.C. Cir. 1983).  See also Havasupai Tribe v. United States, 752 F.
     Supp. 1471, 1488 (D. Ariz. 1990).  However, there is no private cause
20   of action under AIRFA, i.e., it does not provide for individual
     judicially-enforceable rights, and it does not provide a defense to
21   a criminal charge.  See Lyng v. Northwest Indian Cemetery Protective
     Ass'n, 485 U.S. 439, 455, 471 (1988).  Defendant does not cite to the
22   published opinion of a federal court indicating the AIRFA provides a
     defense to the charge against Defendant.
23          Furthermore, any assertion that Defendant's prosecution is barred
     by the existence of a treaty between the Hopi and the United States
24   government is precluded by the United States Supreme Court's opinion
     in United States v. Dion, 476 U.S. 734, 746, 106 S. Ct. 2216, 2224
25   (1986) ("We hold that the Court of Appeals erred in recognizing Dion's
     treaty defense to his Eagle Protection Act and Endangered Species Act
26   prosecutions. For the reasons stated in n. 3, supra, we do not pass
     on the claim raised by amici that the [BGEPA], if read to abrogate
27   Indian treaty rights, invades religious freedom").  See also United
     States v. Fryberg, 622 F.2d 1010, 1012 (9th Cir. 1990) (following
28   other federal courts in concluding that Congress' exception from the
     absolute prohibitions of the BGEPA for Native Americans established

The factual predicate for Defendant's free exercise defense, as stated in his motion to dismiss, is the assertion that the Hopi Tribal Chairman, acting through the tribal Cultural Preservation Office, does not fairly distribute the permits allocated to the Hopi by the USFWS for "taking" golden eagles on, in this particular case, Hopi reservation land. Defendant did not present any evidence to support this contention at the evidentiary hearing.

Defendant asserts his possession of the eagles was for his own personal religious use and to fulfill the religious responsibilities that Defendant, as an elder of his kiva, must fulfill for the spiritual well-being of the other members of his kiva and his clan and his village. Defendant denies he ever traded or bartered for eagle feathers. Although the government does not, apparently, concede that Defendant's possession of the eagles was solely for personal religious use, the government did not present witness testimony or other evidence at the evidentiary hearing that would establish Defendant possessed the eagles in question for other than his personal religious use.

---

Congress' intent to abrogate any broader treaty rights to take bald and golden eagles). But see United States v. White, 508 F.2d 453, 457-58 (8th Cir. 1974) (holding Congress did not clearly abrogate treaty rights in enacting the BGEPA); United States v. Bresette, 761 F. Supp. 658, 663-64 (D. Minn. 1991) (concluding the Chippewa treaty rights encompassed selling eagle parts and that this treaty right was not clearly abrogated in the MBTA); United States v. Abeyta, 632 F. Supp. 1301, 1307 (D.N.M. 1986); United States v. Cutler, 37 F. Supp. 724, 725 (D. Idaho 1941). This Court is not bound by the holding of the Eighth Circuit Court of Appeals or other District Courts, but is bound by the holdings of the Ninth Circuit Court of Appeals.

**Standing**

The government asserts Defendant does not have standing to challenge the permit system as violating his free exercise of his religion because Defendant never applied for a permit to take a golden eagle.

Defendant concedes he did not apply for or obtain a permit from the CPO to gather or possess golden eagles in 2005. Defendant concedes he has never applied for a permit to possess or take golden eagles from the Hopi Cultural Preservation Office and, therefore, that he has never been denied a permit. Defendant testified he believes his permission to take eagles is conferred by his acting in accordance with the tenets of his religious faith, i.e., that properly preparing feathers and prayer objects prior to taking the eagles, as he was taught by his uncles, should be the only "permit" required to take the eagles.

Defendant does not have standing to assert an "as applied" First Amendment free exercise of religion defense to the charge against him because he has never applied for a permit. The failure to apply for a permit to take golden eagles precludes the assertion that the manner in which the MBTA permitting system is administered, with regard to Defendant, violates his personal right to the free exercise of his religion. See United States v. Hugs, 109 F.3d 1375, 1378-79 (9th Cir. 1997) ("As we have noted, however, the [defendants] have never sought to use the permit system and therefore have no standing to challenge the way in which the scheme operates"); United States v. Top Sky, 547 F. 2d 486, 488 (9th Cir. 1976)

(concluding a defendant who had previously procured a permit to possess eagles could not establish standing to challenge the BGEPA's permit system because the defendant provided no evidence the permit system had burdened his own religious exercise); United States v. Winddancer, 435 F. Supp. 2d 687, 694-95 (M.D. Tenn. 2006) (concluding a defendant who had never applied for a permit did not have standing to raise a First Amendment free exercise challenge to a charge of violating the MBTA); United States v. Lundquist, 932 F. Supp. 1237, 1242 n.4 (D. Or. 1990); United States v. Thirty-eight (38) Golden Eagles or Golden Eagle Parts, 649 F. Supp. 269, 277 (D. Nev. 1986).[12]

Defendant argued at the evidentiary hearing he has standing to raise a First Amendment challenge to the permit system based on the Tenth Circuit Court of Appeals' decision in United States v. Hardman, 297 F.3d 1116 (2002), a case involving a prosecution for violation of the Bald and Golden Eagle Protection Act.  Hardman is distinguishable from the instant matter, primarily because the statutes at issue are distinguishable with regard to the defendant's eligibility for a permit to take golden eagles.

The BGEPA prohibits, *inter alia*, the possession of golden eagles and golden eagle parts.  The BGEPA allows for the possession of these birds and parts on a limited basis for, *inter alia*, religious purposes by enrolled members of federally-recognized American Indian tribes.  The BGEPA provides for the possession of golden eagle parts for religious use by means of

---

[12] The District of Nevada case involved the civil seizure of eagle parts, after a criminal prosecution had resulted in a hung jury.

a permitting system allowing the allocation of eagle parts from federal repositories of dead birds and parts.   Entitled individuals may apply for possession of birds or parts from the repositories, which application ensures that the birds or parts will be used for religious, rather than commercial purposes, and only by enrolled members of federally-recognized tribes.   At times, "emergency" orders for feathers from the federal repository may be filled within six months, the wait may otherwise be as long as three years for an eagle carcass.   See Hardman, 297 F.3d at 1123; United States v. Jim, 888 F. Supp. 1058, 1060-61 (D. Or. 1995).   The BGEPA does not allow for exceptions to the prohibitions against possessing golden eagles for Native Americans who are not members of recognized tribes, unlike the MBTA, which does allow for exceptions to the prohibitions for Native Americans who are not members of recognized tribes.   See Winddancer, 435 F. Supp. 2d  at 693.

The Tenth Circuit's conclusion in Hardman, a BGEPA case, was predicated on the fact that the defendant was not a member of a federally-recognized tribe and, therefore, the defendant was not eligible for a permit to possess eagle parts, i.e., applying for a permit would be futile.   The Ninth Circuit reached this same conclusion in United States v. Antoine, 318 F.3d 919 (9th Cir. 2003), a case wherein the defendant was not a member of a federally-recognized tribe who had been charged with violating the BGEPA.   The defendants in both Antoine and Hardman claimed the BGEPA absolutely prohibited legitimate practitioners of American Indian religions, who were not enrolled  members of federally-recognized tribes, as a class,

from acquiring objects necessary to their practice of their religion.  The question presented in those cases was whether an American Indian who was not eligible for a permit to possess eagle parts could establish his free exercise of his religion was substantially burdened by a system which rendered him completely without a means of legally obtaining eagle parts.[13]

Defendant is not similarly situated to the defendants in <u>Hardman</u> or <u>Antoine</u>.  Defendant does not argue the permit system absolutely prohibits him from legally acquiring eagles, he argues his religious exercise is unduly burdened by the administration of the permit system by the Hopi tribe because it discomfits him to deal with the tribal government.  Defendant testified he would comply with a permit regime if he could acquire a permit directly from the United States Fish and Wildlife Service.

Defendant does not have standing to assert the defense the MBTA permitting system as it is applied by the Hopi tribal government violates his constitutional right to the free

---

[13] <u>See</u> <u>United States v. Hardman</u>, 297 F.3d 1116, 1135 (10th Cir. 2002) ("The question at the heart of this case is why an individual who is not a member of a federally recognized tribe is foreclosed from applying for a permit that may be used as a defense to criminal prosecution for possession of eagle feathers, while an identically situated individual may apply for a permit if she is a member of a federally recognized tribe.").
The Ninth Circuit described the question as follows:
[I]n this case, the burden on religion is inescapable; the only question is whom to burden and how much. Both member and nonmember Indians seek to use eagles for religious purposes. The government must decide whether to distribute eagles narrowly and thus burden nonmembers, or distribute them broadly and exacerbate the extreme delays already faced by members. Religion weighs on both sides of the scale.
<u>United States v. Antoine</u>, 318 F.3d 919, 923 (9th Cir. 2003).

exercise of his religion because he did not apply for a permit to possess the forbidden birds. See Hugs, 109 F.3d at 1379 ("the defendants [who had not applied for a permit] are precluded from challenging any deficiencies in the manner in which the permit system operates."); Top Sky, 547 F.2d at 485; Winddancer, 435 F. Supp. 2d at 693-94; Lundquist, 932 F. Supp. at 1242 n.4 ("[the defendant] has no standing to challenge the alleged imperfections of the permit process because he has never applied for a permit.").

Defendant's failure to apply for a permit does not, arguably, preclude him from asserting a facial challenge to the constitutionality of the MBTA in a criminal context. See City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 797 n. 16, 104 S. Ct. 2118, 2125 n.16 (1984) ("[o]ne who might have had a license for the asking may therefore call into question the whole scheme of licensing when he is prosecuted for failure to procure it."); Hugs, 109 F.3d at 1378; Winddancer, 435 F. Supp. 2d at 694. But see Top Sky, 547 F.2d at 489.[14]

To establish the MBTA is facially unconstitutional, Defendant must persuade the Court there is no set of circumstances under which the MBTA could be enforced without

---

[14] Federal courts have jurisdiction to strike down statutes as unconstitutional only when called upon to determine the legal rights of litigants in actual controversy. United States v. Raines, 362 U.S. 17, 21, 80 S. Ct. 519, 522 [] (1960). "(O)ne to whom application of a statute is constitutional will not be heard to attack the statute on the ground that implied it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." Id. United States v. Top Sky, 547 F.2d 483, 489 (9th Cir. 1976).

violating the First Amendment.  See Ohio v. Akron Ctr. for Reproductive Health, 497 U.S. 502, 504, 110 S. Ct. 2972, 2975-76 (1990) (O'Connor, J., concurring); United States v. Salerno, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987).  Defendant does not clearly assert the MBTA permitting regime is not capable of being applied without violating the First Amendment.  Defendant argued in his motion that the permit system as managed by the Hopi Tribal Chairman and the Hopi Cultural Preservation Office inhibits his personal free exercise.  However, Defendant acceded at the evidentiary hearing that he has never been denied a permit, and he presented no evidence of any corruption in the manner in which the Hopi Tribal Chairman administers the permit system.  Indeed, Defendant stated that, if he could acquire the permit directly from the USFWS, he would acquire a permit prior to taking eagles.  Additionally, unchallenged evidence was presented to the Court that "traditional" Hopi people, including one Kikmongwi, have acquired permits to take eagles, apparently without their exercise of their religion being substantially burdened.  Defendant has not stated a claim, or even asserted, that the MBTA is facially invalid.  Therefore, Defendant's motion to dismiss may be denied on the basis that Defendant has no standing to raise an "as applied" challenge to the MBTA and Defendant has not asserted an adequate claim that the MBTA is facially unconstitutional.

**The merits of Defendant's claim that the MBTA is unconstitutional as applied to him because it infringes on his right to the free exercise of his religion**

Defendant contends the Religious Freedom Restoration Act of 1993 ("RFRA") bars his prosecution for violation of the MBTA because the government has not established a compelling interest in protection of the golden eagle. Defendant asserts the federal permitting requirement is unnecessary because the Hopi' taking of golden eagles has never endangered the species' existence. Defendant further maintains any government interest in protecting the golden eagle is "outweighed" by the right of individual Hopi people to "observe their ancient religious practices."

The Religious Freedom Restoration Act ("RFRA") was enacted in 1993 as Congress' response to the free exercise analysis espoused by the United States Supreme Court in Employment Division v. Smith.[15]

---

[15]

Until 1990, the law as declared by the Supreme Court was that the First Amendment prevented infringements on the exercise of religious beliefs except when justified by a compelling interest that could not be achieved through less restrictive means.[] Then, in Employment Division v. Smith, [], the Court held that facially neutral laws would no longer be subject to this level of scrutiny under the First Amendment. However, three years later, the Religious Freedom Restoration Act of 1993 restored the "compelling interest" and "least restrictive means" tests. [] Because the RFRA restored the test used to consider free exercise challenges before Smith, we rely on pre-Smith decisions under the Free Exercise Clause in determining whether the denial of [the plaintiff's] request for an exemption is consistent with the RFRA.

Droz v. Commissioner of Internal Revenue Serv., 48 F.3d 1120, 1122 n.2 (9th Cir. 1995) (internal citations omitted).

The Religious Freedom Restoration Act provides:

> Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.
> (b) Exception
> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.
> (c) Judicial relief
> A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

42 U.S.C. § 2000bb-1 (2003 & Supp. 2006).[16]

RFRA is not interpreted by the federal courts as a "separate" statutory defense to a criminal charge, but as an instruction to the courts to replace the Smith standard for evaluating First Amendment free exercise claims with the "compelling interest" test espoused in Wisconsin v. Yoder. See, e.g., United States v. Bauer, 84 F.3d 1549, 1558 (9th Cir. 1996); Jim, 888 F. Supp. at 1061 ("With the enactment of RFRA, Congress intended that the courts apply pre-Smith case law in determining whether a statute interferes with free expression of religion."). Additionally, some District Courts have added an

---

[16] "[T]he term 'demonstrates' means meets the burdens of going forward with the evidence and of persuasion.... the term 'exercise of religion' means religious exercise, as defined in section 2000cc-5 of this title." 42 U.S.C. § 2000bb-2(3)-(4) (2003 & Supp. 2006).

additional element of analysis to the three-step RFRA test, citing to the pre-<u>Smith</u> Ninth Circuit "standard" case for these claims, <u>Callahan v. Woods.</u>[17]   <u>See</u> <u>Gibson v. Babbitt</u>, 72 F. Supp. 2d 1356, 1361 (S.D. Fla. 1999); <u>Lundquist</u>, 932 F. Supp. at 1240; <u>Jim</u>, 888 F. Supp. at 1061.   <u>But see</u> <u>Hugs</u>, 109 F.3d 1375 (passim) (analyzing a RFRA claim without reference to <u>Callahan</u> or consideration of the nexus element).

Defendant's RFRA claim requires the Court to engage in a burden-shifting analysis.   <u>See</u>, <u>e.g.</u>, <u>Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal</u>, 126 S. Ct. 1211, 1219 (2006).   Defendant must first establish his personal free exercise of his religion was substantially burdened by the relevant government regulation.   <u>See</u> <u>Navajo Nation v. United States Forest Serv.</u>, 408 F. Supp. 2d 866, 903 (D. Ariz. 2006). If Defendant establishes the MBTA substantially burdens his personal free exercise of his religion, the burden shifts to the government to show the MBTA is the least restrictive means of furthering a compelling government interest.   <u>See</u> <u>id.</u>

As stated supra, the burden is initially on Defendant to establish his possession of the eagles was for his own personal, as opposed to commercial, use.   Defendant must also

---

[17] <u>Callahan</u> requires a nexus between the compelling government interest and the means used to further that interest.
> If the compelling state goal can be accomplished despite the exemption of a particular individual, then a regulation which denies an exemption is not the least restrictive means of furthering the state interest. A synthesis of the two prongs is therefore the question whether the government has a compelling interest in not exempting a religious individual from a particular regulation.

<u>Callahan v. Woods</u>, 736 F.2d 1269, 1272-73 (9th Cir. 1984), <u>quoted in</u> <u>Gibson v. Babbitt</u>, 72 F. Supp. 2d 1356, 1361 (S.D. Fla. 1999), <u>citing</u> <u>Harris v. Chapman</u>, 97 F.3d 499, 503 (11th Cir. 1996).

establish the burden on his free exercise of his religion is "substantial," rather than a mere inconvenience.  See Thomas v. Review Bd., 450 U.S. 707, 717-18, 101 S. Ct. 1425, 1431-32 (1981).  See also Lundquist, 932 F. Supp. at 1242; Jim 888 F. Supp. at 1061.

At the evidentiary hearing, Defendant presented the following evidence that his personal free exercise of his religion is substantially burdened by the permitting requirement of the MBTA:

A member of the Hopi Tribal Council, Leon Koruh, testified Defendant is a traditional Hopi, with religious duties to his kiva.  Mr. Koruh testified the permit system is a burden on the ability of Hopi people to practice their religion.  He testified that some individuals collect eagles without a permit and are not prosecuted.  Mr. Koruh testified "everyone would like an eagle."

Another witness testified that traditional Hopi people do not acknowledge the legitimacy of the tribal government. Defendant and the other witnesses testified that requiring a traditional Hopi person to get a permit prior to taking eagles is viewed by traditional Hopi people as unnecessary and as an affront to them, such that this requirement taints the pure spirit of heart necessary for one who is to take eagles. However, noting the differences in language, one of the witnesses who testified on behalf of Defendant regarding the burden placed on traditional Hopi to comply with the permit requirement defined the acquiring of a permit as a "hassle." Defendant testified that the permit system "messed things up."

Defendant testified he did not believe he should have to get a permit because those who taught him his responsibilities as an elder of a kiva did not get permits before taking eagles as part of this responsibility. Defendant's counsel asserted that applying for a permit to take a golden eagle was a "sacrilege" to Defendant's religion.

Defendant alleged in his motion to dismiss that the Hopi tribal government does not fairly administer the process of distributing permits to take golden eagles. Defendant's written motion alleged the tribal government "is rife with cronyism and religious discrimination." Docket No. 27 at 3. However, at the evidentiary hearing Defendant apparently abandoned this argument by not presenting any evidence of how the system of allocating permits by the Cultural Preservation Office was corrupted, i.e., by producing testimony that any individual had been denied a permit for personal, religious, or other discriminatory reasons.

The Court is sympathetic to the conflicts within the Hopi community with regard to "traditional" and "non-traditional" Hopi individuals and their view of the validity or invalidity of the system of tribal government currently in place. However, this Court is not the appropriate venue for the resolution of political and cultural issues among Hopi people.

Although other federal courts have determined that requiring an American Indian to acquire a permit prior to taking an eagle for religious purposes constitutes a substantial burden on their free exercise of their religion, this Defendant has not presented sufficient evidence the permit requirement "substantially" burdens his personal free exercise of his

-23-

religion.   The testimony indicated Defendant did not find applying for a permit objectionable, he found applying for a permit from the Hopi tribal government objectionable.  Defendant did not testify he believed the permit requirement would require undue physical effort on his part, or require him to endure any delay in performing rites necessary to the free exercise of his religion.  The testimony indicated the permit requirement places only a subjective emotional burden on Defendant.  Compare Hugs, 109 F.3d at 1378 ("We do not question that the BGEPA imposed a substantial burden on the practice of such religions by restricting the ability of adherents to obtain and possess eagles and eagle parts."); Gibson v. Babbit, 223 F.3d 1256, 1258 (11th Cir. 2001); Hardman, 297 F.3d at 1126-27 ("Any scheme that limits [legitimate practitioners of American Indian religions] access to eagle feathers therefore must be seen as having a substantial effect on the exercise of religious belief."); United States v. Gonzales, 957 F. Supp. 1225, 1228 (D.N.M. 1997) (holding that regulations requiring the defendant "to state on an application the name of the tribal religious ceremony for which he seeks an eagle and requiring him to obtain certification from a religious elder to the effect that he is authorized to participate in that ceremony, constitute a substantial burden on his exercise of his religion."); Lundquist, 932 F. Supp. at 1242.

The Court concludes Defendant's free exercise of his religion, although slightly burdened, is not substantially burdened by the requirement that he acquire a permit from the Hopi tribe prior to collecting an eagle.  Defendant's mental

discomfiture in acknowledging the legitimacy of the Hopi tribal government by applying for a permit to take eagles is analogous to the situation of a conscientious objector being forced to register for a military draft. See United States v. Bigman, 429 F.2d 13, 14-15 (9th Cir. 1970) (citing the "unbroken line of authority" in the Circuit Courts of Appeal that the compulsory registration procedures of the Selective Service Act did not impermissibly burden a defendant's free exercise of his religious beliefs against compliance with those procedures).

**Compelling interest**

Whether a proffered government interest qualifies as a compelling interest is a question of law. Hardman, 297 F.3d at 1127. Allowing in the abstract that Defendant has established a substantial burden on the free exercise of his religion, the burden shifts to the government to show a compelling interest in enacting the MBTA and promulgating the permitting regulations. However, to the extent Defendant is arguing something has changed with regard to the necessity for protecting golden eagles, the burden of going forward with evidence does not shift. The party claiming only that changed circumstances render a statute invalid, i.e., as serving an interest which is no longer compelling, bears the burden of producing evidence sufficient to convince the Court a substantial change in relevant circumstances has occurred. See Antoine, 318 F.3d at 921-22 (concluding the government should not be forced to relitigate its compelling interest in protecting bald and golden

eagles with each prosecution for violation of the BGEPA).[18]

It has been suggested the following government interests are served by the MBTA and that these interests are compelling interests:

1. The United States' international treaty obligations to protect this species;

2. The federal government's interest in fulfilling its trust obligations to tribes, i.e., to protect tribal resources to ensure the tribes' culture and sovereign integrity;[19]

3. The United States' interest in fairly adjudicating conflicts between Navajo and Hopi people and tribal governments regarding the land area formerly known as the "joint use" area, acknowledging the conflicts were exacerbated by the federal government;

---

[18]

[C]hanged circumstances may, in theory, transform a compelling interest into a less than compelling one, or render a well-tailored statute misproportioned. Nonetheless, the government cannot reasonably be expected to relitigate the issue with every increase in the eagle population. ... Such an approach would plague our circuit law with inconsistency and uncertainty. A party claiming that time has transformed a once-valid application of a statute into an invalid one must adduce evidence sufficient to convince us that a substantial change in relevant circumstances has occurred. The proposal to delist does not meet this standard.

United States v. Antoine, 318 F.3d 919, 921-22 (9th Cir. 2003).

[19] The evidence presented to the Court indicates that the specific sites where eaglets are collected is important to the Hopi village and clan culture and religious purposes. In areas where the collecting of golden eagles is less-restricted by the CPO, i.e., a permit is required but the particular site is not strictly protected as to whom, by clan or village, may collect from these sites, there is a "race" to collect eaglets before they are fledged resulting in unnecessary death to the eaglets.

4. The acknowledged need to preserve local populations of golden eagles and bald eagles in part because of the symbolism attached to eagles by both the Hopi and United States' culture;

5. The golden eagles' role in maintaining the health of the local ecosystem.

In the context of cases asserting a defense of freedom of religious exercise by Native American individuals to a violation of the Bald and Golden Eagle Protection Act or the MBTA, the federal courts have concluded the protection of bald and golden eagles is a compelling government interest. See Hugs, 109 F.3d at 1378-79 (holding that the BGEPA served a compelling government interest); Hardman, 297 F.3d at 1127-28 (citing Missouri v. Holland, 252 U.S. 416, 435, 40 S. Ct. 382, 384 (1920)); Oliver, 255 F.3d at 589.

Defendant argues the government's interest is not compelling because the golden eagle is not endangered or threatened. The fact that the golden eagle is not listed as a threatened or endangered species does not, as a matter of law, establish the government's interest in protecting this species is less than compelling. See Antoine, 318 F.3d at 921-22 (stating the defendant must produce evidence there has been a substantial change in the relevant circumstances). See also Hardman, 297 F.3d at 1128.

Defendant contends the government has not met its burden in establishing a compelling interest in permitting the take of golden eagles by the Hopi. At the evidentiary hearing, Defendant argued there is "no evidence this [permit requirement]

is not a burden" on Defendant's free exercise of his religion. Defendant has also presented a document issued by the United States Fish and Wildlife Service in 2004 regarding a 2003 population survey of golden eagles in the western United States. Docket No. 36, Attach.[20]   Defendant argues this document meets his burden of establishing changed circumstances have rendered the government's interest in protecting golden eagles less than compelling.  Additionally, Defendant asserts this document is an "admission" by the government that the golden eagle is not endangered as a species in the western United States.[21]

The evidence of changed circumstances presented by Defendant does not establish the government's continued interest in regulating the take of this species has become less than compelling.  The evidence presented by Defendant is not relevant to establishing any alleged increase or decrease in the number of golden eagles within the Hopi reservation; a close reading of this evidence, as presented by Defendant during the evidentiary hearing, indicates not a single golden eagle was surveyed within the boundaries of the Hopi reservation pursuant to this report.

---

[20] Rhett E. Good, et al., Population Level Survey of Golden Eagles (*Aquila chrysaetos*) in the Western United States, Aug. 30, 2004 (Prepared for the USFWS Service).

[21] Defense counsel averred he acquired this document from the Internet.  Defense counsel did not present the testimony or affidavit of the report's author or any scientist regarding a proper interpretation of the report.  Additionally, at the hearing the Court noted the difficulty of assessing the validity of Defendant's assertation regarding the health of the golden eagle species from the black-and-white copies of the maps included in the report provided by Defendant.  Defense counsel assured the Court a color copy of the maps would be supplied, however, no such copy has been provided and defense counsel has left the Court to divine the adequacy of Defendant's argument from the shades of gray on the maps presented as evidence.

-28-

The study extrapolates an estimated population of golden eagles in the western United States in 2003 as 27,392, from transects wherein an actual 172 eagles were observed. <u>Id.</u>, Attach. at 38. Although the document cites to prior published assessments of eagle populations, the document does not opine as to question whether the golden eagle population within the Hopi reservation boundaries is declining, stable, or increasing.  The study states, with regard to these birds in Arizona, "Number of currently active territories are not known." <u>Id.</u>, Attach. at 43.[22]

At the evidentiary hearing, Defendant encouraged the Court to follow the holding of a federal court which concluded, based on the evidence presented to that court, that the government does not have a compelling interest in protecting golden eagles. <u>See</u> <u>United States v. Abeyta</u>, 632 F. Supp. 1301, 1306 (D.N.M. 1986).  The Court notes this decision was issued in 1986 and that every federal court which has subsequently considered this issue, including the District of New Mexico in

_____

[22]  The relevant document is available at: www.r6.fws.gov/species/birds/golden_eagle/Final_Golden_Eagle_Report _8_30_04.pdf.  The color map included in the document indicates that one or two eagles were located within a transect which appears to be within or close to the Hopi reservation. <u>See</u> Good, et al., Population Level Survey of Golden Eagles (<i>Aquila chrysaetos</i>) in the Western United States (cited supra at n.20) at 56.  It appears no eagles were located within two other transects close to the Hopi reservation. <u>Id.</u> This information does not alter the Court's conclusion regarding the compelling nature of the governnment's interest in protecting golden eagles.  The evidence attached to the government's response to Defendant's hearing memorandum is more relevant to, and revealing of, the compelling nature of the government's interest in limiting the taking of eagles within the confines of the Hopi reservation. <u>See</u> Docket No. 40, Attach. (United States Fish and Wildlife Service, Statement of Decision, Migratory Bird Treaty Act Permit to Take Golden Eagles for Religious Purposes by the Hopi Tribe on Ancestral Lands (Apr. 2003)).

1997, has come to the contrary conclusion.  <u>See</u> <u>Gonzalez</u>, 957 F. Supp. at 1228.  Additionally, subsequent to the <u>Abeyta</u> decision, the Ninth Circuit Court of Appeals has issued decisions binding on this Court contrary to the conclusion reached by the District of New Mexico.  <u>See</u> <u>Antoine</u>, 318 F.3d at 922; <u>Hugs</u>, 109 F.3d at 1378-79.

The factual and legal predicates for the <u>Abeyta</u> decision are clearly distinguishable from the instant matter. The District of New Mexico <u>Abeyta</u> court concluded the government had not established a compelling interest in protecting the birds because the golden eagle was not an endangered species, contrary to the subsequent Ninth Circuit opinion in <u>Antoine</u> in 2003.  Additionally, the <u>Abeyta</u> court was presented with entirely different evidence regarding the availability of permits than that presented to this Court.  The judge in <u>Abeyta</u> was clearly concerned about what he viewed to be a racial basis for enforcement of the BGEPA as against a Native American defendant at that time.  For instance, in <u>Abeyta</u>, the court was presented with evidence that the USFWS had permitted ranchers to kill eagles as predators, while denying American Indian people permits to take eagles for their religious use.  <u>See</u> <u>Jim</u>, 888 F. Supp. at 1064.  In concluding a less burdensome means could be used to serve the purpose of conserving the species, the court stated the "federal administrative apparatus" was "utterly offensive and ultimately ineffectual."  <u>Abeyta</u>, 632 F. Supp. 1307.  The court also concluded the permit process was "cumbersome, intrusive and demonstrat[ing] a palpable insensitivity to Indian religious beliefs."  <u>Id.</u>

Defendant has not met his burden in establishing a change in circumstance has rendered the government's interest in protecting golden eagles less than compelling.   Additionally, the Court concludes the government has established the government has a compelling interest in protecting golden eagles.   Therefore, the Court proceeds to the third step of the RFRA analysis.

**Least Restrictive Means**

To prevail on this prong of the analysis, "the government must show that [its] objectives cannot be advanced through use of a regulation that is less intrusive of [the defendant's] religious practices, and that refusing his exemption is, therefore, the least restrictive means of preserving eagle populations." Lundquist, 932 F. Supp. at 1240. The Ninth Circuit has held the government meets its burden of showing a system is the least restrictive means if "it demonstrates that it actually considered and rejected the efficacy of less restrictive means before adopting the challenged practice." Warsoldier v. Woodford, 418 F.3d 989, 999 (9th Cir. 2005) (reaching this conclusion in the context of a Religious Land Use and Institutionalized Persons Act case); Antoine, 318 F.3d at 923-24.

Defendant argued in his motion to dismiss that the permitting system allowing the Hopi Tribal Chairman to distribute USFWS permits to take golden eagles is not the "least restrictive" means of burdening his religious practice because the Hopi tribal government does not allocate the permits fairly. At the evidentiary hearing, Defendant did not present any

-31-

evidence that the current Hopi tribal government has denied anyone a permit to take golden eagles.  A Hopi elder testified at the evidentiary hearing that the "old system" worked better, i.e., the system of self-regulation without permits.

The Court is not convinced by this limited evidence that the current permit system is not the least restrictive means of addressing the compelling government interests at stake.  The section of the Code of Federal Regulations[23] which

---

[23]
*We will issue a permit only to members of Indian entities recognized and eligible to receive services from the United States Bureau of Indian Affairs listed under 25 U.S.C. 479a-1 engaged in religious activities who satisfy all the issuance criteria of this section....*
*... You must submit applications for permits to take, possess, transport within the United States,... lawfully acquired bald or golden eagles, or their parts, nests, or eggs for Indian religious use to the appropriate Regional Director--Attention: Migratory Bird Permit Office. You can find addresses for the appropriate Regional Directors in 50 CFR 2.2. ... Your application for any permit under this section must also contain the information required under this section, § 13.12(a) of this subchapter, and the following information:*
***
In addition to the general conditions in part 13 of this subchapter B, permits to take, possess, transport within the United States... bald or golden eagles, or their parts, nests or eggs for Indian religious use are subject to the following conditions:
***
(2) *You must submit reports or inventories, including photographs, of eagle feathers or parts on hand as requested by the issuing office.*
(c) How do we evaluate your application for a permit? *We will conduct an investigation and will only issue a permit to take, possess, transport within the United States,* bald or golden eagle parts...for Indian religious use when we determine that the taking, possession, or transportation is compatible with the preservation of the bald and golden eagle. *In making a determination, we will consider, among other criteria, the following:*
*(1) The direct or indirect effect which issuing such permit would be likely to have upon the wild populations of bald or golden eagles; and*
*(2) Whether the applicant is an Indian who is authorized to*

Defendant cites to as requiring the federal government to issue these permits only to individuals, is undoubtedly more cumbersome, personally intrusive, and time-consuming for applicants. Additionally, this section also requires applicants to take eagles to be enrolled members of federally-recognized tribes and, therefore, the taint of governmental interference and tribal governmental acknowledgment of one's "legitimate" Hopi status would not be cured by means of this permit system.

In every case except <u>Abeyta</u> and <u>Hardman</u>,, the federal courts have concluded the MBTA and BGEPA permitting regimes were the "least restrictive" means of protecting eagle populations and Native American religions. Additionally, the <u>Hardman</u> opinion did not conclude the BGEPA permitting system was not the least restrictive means of regulating the possession of eagles and eagle parts for religious purposes; the appellate court remanded the matter to the District Court to acquire further evidence on the least restrictive means prong of the requisite analysis.

The precedent of the Ninth Circuit Court of Appeals is binding on this Court. In <u>Hugs</u>, the Native American defendants presented a claim raised they should not be subject to the permit requirements of the BGEPA. The Ninth Circuit Court of Appeals analyzed the BGEPA under the Religious Freedom Restoration Act's "substantial burden" test and concluded the

_____

*participate in bona fide tribal religious ceremonies.*
...A permit issued to you that authorizes you to take bald or golden eagles will be valid during the period specified on the face of the permit, but will not be longer than 1 year from the date it is issued.
50 C.F.R. § 22.22 (2006).

BGEPA was the "least restrictive" means of serving the compelling government interest of protecting eagles. See 109 F. 3d at 1378-79.   The Ninth Circuit held in Antoine that the permit system for taking bald and golden eagles established by the BGEPA did not violate the "least restrictive" means test established by RFRA, and that Huqs required it to find the permitting system was the least restrictive means.   318 F. 3d at 923-24.   Therefore, the Court concludes the permitting system challenged by Defendant satisfies RFRA's least restrictive means test.

## Conclusion

Defendant does not have standing to raise the argument that the MBTA permit system is unconstitutional, as managed by the Hopi tribal government and as it has been applied to him. Defendant has not properly stated an argument that the permitting system he challenges, or the MBTA itself, is facially unconstitutional.   Additionally, Defendant's prosecution does not violate his First Amendment right to the free exercise of his religion.  Defendant has not demonstrated that his personal free exercise of his religion has been substantially burdened by the permit requirement.   The government has established a compelling interest in the protection of golden eagles and that the permit system is the least restrictive means of serving that interest.   Defendant has not produced sufficient evidence to establish that a substantial change in the relevant circumstances has rendered the government's interest less than compelling.

1       **THEREFORE, IT IS ORDERED that** Defendant's motion to

2 dismiss at Docket No. 27 is **denied.**

3       DATED this 11th day of September, 2006.

4

5

6                           _____

7                                 Mark E. Aspey
                          United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28